1

2

3

4

5

6               UNITED STATES DISTRICT COURT

7          FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9  ROBERT CONNOR WRIGHT,
                                        NO C-06-0925-VRW
10          Petitioner,
                                        ORDER DENYING PETITION FOR A
11        v                             WRIT OF HABEAS CORPUS

12

13  ROBERT A HOREL,

14          Respondent.

15

16

17  _____

18          Petitioner Robert Connor Wright, a state prisoner

19  incarcerated at the Pelican Bay State Prison in Crescent City,

20  CA, seeks a writ of habeas corpus under 28 USC section 2254.  For

21  the reasons set forth below, a writ is DENIED.

22

23                            I

24          On October 7, 2002, after a jury trial in Tuolumne

25  County superior court, petitioner was found guilty of voluntary

26  manslaughter of one Michael Gilligan.  Two co-defendants, Michael

27  John Davies and Edward Mendez, were also convicted in connection

28  with Gilligan's homicide; Davies was convicted of first degree

murder and Mendez of voluntary manslaughter. Petitioner was
sentenced to eleven years, and because he admitted a prior
"strike" conviction, pursuant to Penal Code 667(b)-(I), the
sentence was doubled for a total term of twenty-two years;
petitioner subsequently appealed unsuccessfully.

On January 18, 2005, in an unpublished opinion, the
California Court of Appeal affirmed the judgment.[1] Petitioner's
petition for review with the California Supreme Court was denied
"without prejudice to any relief to which defendant might be
entitled after this court determines in *People v. Black*, S126182,
and *People v. Towne*, S125677, the effect of *Blakely v. Washington*
(2004) ___ U.S. ___ 124 S.Ct. 2531, on California law."

Petitioner filed his federal court petition on July 19,
2006. Per order filed on August 8, 2008, the court ordered
respondent to file an answer to the petition. Respondent filed
an answer addressing the merits of the petition on October 3,
2008 and petitioner filed a traverse on January 21, 2009.

Petitioner raises nine claims in his petition. Five of
these assert instructional errors by the trial court. One claim
of instructional error relates to omission of the "natural and
probable consequences" doctrine that applies to voluntary
manslaughter, and three to the requirements for aiding and
abetting liability. A fifth claimed instructional error relates
to the trial court's failure to instruct on involuntary

_____

[1] Because the opinion by the California Court of Appeal was
unpublished, this court will refer to the lodged opinion
("Opinion") throughout this order. The full opinion was lodged
by respondent on January 31, 2008 as Lodged Document 2.

manslaughter.  In addition, petitioner claims that his speedy trial rights were violated, that the trial court made an erroneous evidentiary ruling and that his counsel was ineffective.  Finally, petitioner maintains that his upper-term sentence of twenty-two years was imposed in violation of the Sixth Amendment.

Before turning to the rather lengthy recitation of facts pertinent here, the court notes that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 USC section 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the [p]etitioner is not challenging his underlying state court conviction."  <u>White v Lambert</u>, 370 F3d 1002, 1009-1010 (9th Cir 2004).  Under AEDPA, this court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 USC section 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 USC § 2254(d).  Under this deferential standard, federal habeas relief will not be granted "simply because [this]

court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Williams v Taylor</u>, 529 US 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 USC section 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id at 412; <u>Clark v Murphy</u>, 331 F3d 1062, 1069 (9th Cir 2003).

## II

Michael Gilligan, the homicide victim, was a 45-year-old alcoholic. He moved to Sonora in late 2000 following a serious illness that left him in a weakened state. Gilligan's mother * * * took care of his finances. She paid for his apartment rent, paid his bills, and gave him a small sum of cash each week.

* * *

On February 26, 2001 (two days before Gilligan's body was discovered), Casty Santos went to Gilligan's apartment to install cable television. She arrived in the afternoon. Gilligan was there, as was Davies.[2] They were both drinking beer. Gilligan was expecting a check to arrive in the mail. Davies went to the mailbox and retrieved the check. He handed it to Gilligan. Santos heard Gilligan talking on the telephone. He said, "You and Ziggy [the nickname for Mendez] better get up here and get your stuff off this lady's property because she's going to throw it away." Santos did not see a pizza box nor did she notice any blood on the couch when she moved it. She testified she would have noticed the blood on the couch if it had been there at the time.

---

[2] Opinion Footnote 2: We refer to Wright as defendant; we refer to the codefendants by their last names.

4

That same day, a pizza order was called in at 6:20 p.m. The pizza was delivered to Gilligan's apartment around 7:00 p.m. A man answered the door and paid with money from his wallet. The person who answered the door did not look like defendant, Davies or Mendez, but there was at least one other person inside the apartment.

* * *

Anna Healy lived next door to Gilligan's apartment. She knew defendant, Mendez and Davies, having seen them at Gilligan's apartment on previous occasions. She could recognize Gilligan's voice. She frequently went out to her porch to smoke. On February 27, 2001 at approximately 8 p.m. Healy saw Mendez and another man on Gilligan's porch.

At approximately 8:30 p.m. Healy heard Davies say, "Give me another fucking beer." Gilligan said, "Are you fucking with me?" Defendant said "damn" and laughed. It sounded like the group was joking around.

* * *

Deborah Davis was a neighbor of Gilligan's. She saw Defendant leaving the area of Gilligan's apartment at approximately 9:45 in the evening.

Neighbor Jennifer Grove heard a loud thump and nothing else. A few hours later she woke up to the sound of glass breaking. Several other neighbors heard glass breaking at approximately 10 p.m. Anna Healy and Dovilio Garello went outside after hearing the glass break; they did not see anything unusual. Larry Coombes heard the sound of glass breaking shortly after 10 p.m. He went outside and saw the end of a leg going through a window at Gilligan's apartment. The person had on tan pants. Coombes sat on his patio for 25 minutes and did not see anyone exit the front door. He decided someone had locked himself out of the apartment and had gained entrance through the window.

Kristina Lowry was at a bar on February 27, 2001. Mendez arrived at the bar at approximately 10:30. He was out of breath, sweating, and nervous. Mendez and several others left and spent the night in the house of a friend. At 5 a.m. Lowry woke up. She saw Mendez sitting up playing with what appeared to be a knife.

James Walsh frequently socialized with Davies, Mendez and defendant. They would drink alcohol. He was with defendant and Mendez when he was arrested on February 27, 2001 at approximately 5 p.m. and placed in jail. Walsh was released at approximately 5 a.m. on

February 28. After his release, he bought beer and went to the park to drink. Ed Long was there. Long had previously told Walsh that Gilligan would let the homeless drink at his house and then he would kick them out in the middle of the night when there was no more alcohol. Davies arrived and they drank together. Davies said that Gilligan had been hurt or killed. [footnote 3 omitted].

Walsh and the others continued to drink. At approximately 10 a.m., Walsh called Davies a "punk" and Davies punched him in the face. Walsh began to bleed. Davies helped clean up Walsh. Walsh then went to a medical drop-in center for bandages. Walsh told someone at the center that Gilligan was not a nice guy, but he did not deserve to die. Gilligan's neighbor, Healy, saw Walsh on the afternoon of the 28th. Walsh had blood on him and told her that Gilligan had been killed.

* * *

Gilligan's mother attempted to contact Gilligan on the 28th. After she called several times and he failed to answer the telephone, she went to his apartment at approximately 4 p.m. She had a key to the apartment. She opened the door and saw Gilligan on the floor. She called out to her husband and her husband called 911. There was glass on the floor as well[] as a flowerpot that Gilligan kept on the front porch.

Police officer Harold Prock arrived at Gilligan's apartment. He entered and saw Gilligan on the floor; his head was covered with a towel. Prock removed the towel from Gilligan's head. He was not breathing and did not have a pulse.

Forensic pathologist Dr. Jennifer Rulon conducted an autopsy on Gilligan's body. An external exam of the body revealed numerous injuries, too many for Dr. Rulon to put on one diagram. Gilligan had facial bruising on the right and left side and scrapes to his face. He had bruising on the back of his head as well as along the jawline. His nose was broken. He had lost two teeth and there were blunt force injuries to his mouth, around his eyes, and under the surface of both eyelids. His head injuries were consistent with being struck with a fist or a shoe. He had stab wounds to his left eye.

Gilligan had abrasions on his neck, arm and knee. He had bruises on his back, calf, shoulder, and hand. Gilligan had sharp force injuries to the back of his right hand. In addition, he bore an incision to his neck traveling from ear to ear under the jawline. The wound went through the base of his tongue, his

esophagus, all carotid arteries, and all major vessels and nerves of the neck. The spine was not severed, but it was cut. It was likely that the person who cut Gilligan's neck was behind Gilligan when he did the cutting.

An internal examination revealed that the hyoid bone in Gilligan's neck was broken. Additionally, he had fractures to the ribs and spine. His brain displayed bleeding.  His liver was torn and he had blood in his abdomen.  It was stipulated that Gilligan's blood alcohol level was .22 percent at the time of his death.

Dr. Rulon opined that Gilligan's hand wounds were defensive wounds and his broken back was likely caused by a stomping. Several of his injuries could have been lethal and some injuries could have caused unconsciousness. The liver injury was lethal and the neck wound was clearly lethal. Dr. Rulon concluded that the cause of death was multiple sharp and blunt force injuries and the injury to the neck. From the blood evidence it appeared that the neck wound was inflicted while the victim was on the ground. In all likelihood, he was lifted up, his throat was cut, and he was put back down on the floor.

Fingerprint evidence was obtained from Gilligan's apartment. Mendez's fingerprint was on a pie dish in the apartment. Two fingerprints of defendant were on the inside of the glass bedroom door. Davies's prints were found on a glass cup, a white bowl, a pizza box, and on Gilligan's glasses. There were other prints in the apartment that did not match any of the defendants' [fingerprints].

Several areas of blood were found in the apartment. There was blood from arterial spurting on the coffee table. There was blood spatter on the coffee table, the wall by the victim's head and the kitchen floor. This blood belonged to the victim. There were blood drops on the brass strip at the threshold of the front door. This blood belonged to defendant. There were bloodstains on the left arm of the couch and another bloodstain on the back of the couch. The stain on the back of the couch was darker in color and appeared older. The stain on the arm of the couch was from Davies; the stain on the back of the couch was from defendant. A piece of skin found on the broken glass window came from Davies. The blood on the kitchen floor had shoe impressions; the impressions matched Davies's shoe.

On the evening of February 28, 2001, officers went to the park. They talked to Davies and Mendez. They

came to the police station and their clothes were
seized. Davies had a laceration on his hand and
scratches on his neck and hands. There was a blood
smear on the left leg of his jeans. Mendez had an
abrasion on his right cheek.

There were two small blood spots on Mendez's
jacket. The blood on the jacket came from the victim.
There was blood on Davies's boot, sweatshirt, jeans,
and socks. The stains on Davies's jeans matched his
[own] blood. The human bloodstains on Davies's shoes
and socks appeared to have been washed. The stains on
the shoes and socks could not be typed for DNA.

* * *

A videotape of a nearby store was produced. It
showed defendant and Mendez in the store on February
27, 2001 buying alcohol at 4:30 p.m.  Davies was in the
same store that evening buying alcohol at 5:47, 7:03,
7:28 and 8:33 p.m. Defendant was with Davies on the
last two occasions.

Terry Keever was in custody in the jail, housed in
a cell between Davies and defendant. Keever agreed to
testify truthfully regarding written notes (kites) sent
to him by Davies while in custody and to conversations
he had with defendant and Davies in jail.

* * *

Jacqueline McLaughlin was defendant's girlfriend.
She knew Gilligan. On the evening of February 27, 2001
Gilligan called her. He told her there was a party
going on and things were getting out of hand. She asked
if he needed help. He said no because Mendez was there.
Gilligan said they were drinking beer and eating pizza.
Defendant was with her when she received the call. She
fell asleep and does not know if he left or not. When
she awakened, defendant and Mendez were there. Mendez
said to defendant that they found Gilligan's body and
needed to clean up the mess so Gilligan's parents would
not find him that way. On February 28, 2001, Mendez
came to McLaughlin's apartment with Davies. Mendez said
he had some bad news. McLaughlin said she did not want
to hear it. Sometime after February 28, 2001,
McLaughlin found a pair of pants in the laundry room.
They had brownish stains on them. She cut them up and
used them for cleaning rags. When McLaughlin was
interviewed by police, she told them that defendant had
told her he had cleaned up the mess at Gilligan's
apartment so Gilligan's parents would not see it.
McLaughlin was hospitalized for mental problems at the
time of the interview.

Opinion at 2-8.

A joint complaint charging petitioner, Davies and Mendez was filed on September 14, 2001. The defendants were arraigned on December 28, 2001 and waived their right to have a trial within 60 days. Counsel for Davies requested a trial date for April 2002 in order to test the DNA evidence and retain experts. Opinion at 18.

In April 2002, Davies asked for a further continuance over the objection of Mendez and petitioner, both of whom informed the court that they no longer wanted to waive time. The trial court found good cause for a continuance and reset the trial date to July 17, 2002. After a hearing on July 2, 2002, where counsel for Davies requested another DNA-related continuance over petitioner's objections, the court set a trial date for August 28, 2002. The court subsequently granted a further one-week continuance based on good cause and set trial for September 4, 2002. The case was called on September 3, 2002 and proceeded to trial. Opinion at 18-20.

Petitioner testified on his own behalf at trial. He testified that while he had gone to Gilligan's apartment on the 27th, he did not go inside and was gone by approximately 9:30 pm. Opinion at 9-10. He also testified that he had nothing to do with Gilligan's death. Opinion at 10.

John Isley also testified as a witness for petitioner. Petitioner's counsel questioned Isley about petitioner's behavior; Isley testified that he had never seen petitioner hit anyone or get in a fight. Based on this questioning, the prosecutor argued that Isley was a character witness for

9

petitioner, and that the government was allowed to introduce evidence about petitioner's prior violent acts.  The trial court agreed, and the prosecutor subsequently introduced evidence, over defense counsel's objection, of petitioner's prior convictions and arrest for assault and battery.  Opinion at 30-31.

Terry Keever, a jail inmate housed near petitioner, testified for the state.  During his testimony, Keever stated, *inter alia*, that petitioner had told him that he (petitioner) had nothing to do with the killing and that he (petitioner) thought that Davies had killed Gilligan.  Keever also stated that petitioner told him that Mendez had put the knife used in the killing down a mineshaft.  Upon objection by petitioner's counsel that Keever was testifying as to knowledge gained after he became a government agent, the trial judge struck all of Keever's testimony concerning petitioner.  Opinion at 26-28.

A number of petitioner's claims involved alleged instructional error.  The jury at petitioner's trial was instructed that it could find petitioner guilty of murder as a natural and probable consequence of an assault on Gilligan.  Opinion at 13-14.  The jury was not, however, instructed as to the elements necessary to convict of manslaughter under the natural and probable consequences doctrine.  Opinion at 10-11.

The trial court did not instruct the jury that if they had a reasonable doubt whether petitioner committed voluntary manslaughter, but believed he committed involuntary manslaughter, they must give him the benefit of the doubt and find him guilty of the lesser offense of involuntary manslaughter.  The trial court did instruct the jury with the benefit of the doubt

instructions between first degree murder and second degree murder, and between murder and manslaughter.  Opinion at 35-37.

The jury was also instructed on aider and abetter liability, and termination of liability of an aider and abettor. The jury was not, however, instructed on the burden of proof it should apply in determining whether petitioner had terminated his liability as an aider and abettor.  Opinion at 38.

After petitioner was found guilty of voluntary manslaughter, the trial court sentenced defendant to the aggravated term of eleven years, doubled to twenty-two years under the Three Strikes Law.  The trial court chose the aggravated terms, finding *inter alia* that the crime involved great violence and acts of viciousness.  Opinion at 39.  The trial court also relied upon and adopted the findings of the probation report, including petitioner's prior convictions and his probationary status.  Opinion at 39-40.

A

In his first claim for relief, petitioner alleges that the trial court violated his constitutional rights by permitting the jurors to convict him of voluntary manslaughter under the natural and probable consequences doctrine without a proper instruction.  According to petitioner, the jurors necessarily convicted him based on the natural and probable consequences doctrine, even though instructions on that doctrine as it pertained to voluntary manslaughter were not given to the jury.

The California Court of Appeal addressed this claim in a reasoned opinion on direct appeal and concluded that petitioner

had not demonstrated reversible error.  The state court found

"there were other viable theories available to the jury to find

defendant guilty."  Opinion at 11.  The jury could have found,

for example, that petitioner aided and abetted the slitting of

the victim's throat but had a less culpable mental state than

Davies.  In addition, based on the evidence that there were

concurrent causes of Gilligan's death (the initial brutal beating

and the subsequent throat-slitting), the jury could have found

that petitioner participated in the first beating only, but due

to intoxication or heat of passion, he was guilty of voluntary

manslaughter and not murder.  Opinion at 12.  Finally, the state

court found that any instructional error did not result in

prejudice to petitioner.  The court found that "accepting

defendant's underlying premise, the court failed to give

instructions that would have allowed a conviction on an available

theory – natural and probable consequences.  The elimination of a

theory as a basis to find defendant guilty could only have inured

to his benefit.  Absent a showing of prejudice, a defendant may

not complain of instructional error favorable to him.  (*People v.*

*Lee* (1999) 20 Cal. 4th 47, 57.)"  Opinion at 13.

To obtain federal collateral relief for instructional

error, a petitioner must show that the ailing instruction or the

lack of instruction by itself so infected the entire trial that

the resulting conviction violates due process.  See <u>Estelle v</u>

<u>McGuire</u>, 502 US at 72); see also <u>Donnelly v DeChristoforo</u>, 416 US

637, 643 (1974) ("'[I]t must be established not merely that the

instruction is undesirable, erroneous or even "universally

condemned," but that it violated some [constitutional right].'").

The instruction may not be judged in artificial isolation, but
must be considered in the context of the instructions as a whole
and the trial record.  See Estelle, 502 US at 72.  In other
words, the court must evaluate jury instructions in the context
of the overall charge to the jury as a component of the entire
trial process.  United States v Frady, 456 U.S. 152, 169 (1982)
(citing Henderson v Kibbe, 431 US 145, 154 (1977)); Prantil v
California, 843 F2d 314, 317 (9th Cir), cert denied, 488 US 861
(1988); see also, Middleton v McNeil, 541 US 433, 434-435 (2004)
(per curiam) (no reasonable likelihood that jury misled by single
contrary instruction on imperfect self-defense defining "imminent
peril" where three other instructions correctly stated the law).

          Here, petitioner has not demonstrated that the state
court's reasoned opinion is contrary to, or an unreasonable
application of, clearly established United States Supreme Court
law.  Petitioner also fails to demonstrate that the state court's
opinion relied on an unreasonable determination of the facts.
As the state court reasonably confirmed, there were at least two
theories under which the jury could have found defendant guilty
of voluntary manslaughter that were not reliant on the "natural
and probable consequences" theory.  Opinion at 11-12.  As such,
any instructional error does not rise to the level of a due
process violation.  See Estelle, 502 US at 73.

          Moreover, petitioner cannot demonstrate that he
suffered any prejudice as a result of alleged instructional
error.  Even if a petitioner meets the requirements of section
2254(d), habeas relief is warranted only if the constitutional
error at issue had a substantial and injurious effect or

influence in determining the jury's verdict.  <u>Brecht v</u>
<u>Abrahamson</u>, 507 US 619, 638 (1993).  Under this standard,
petitioners "may obtain plenary review of their constitutional
claims, but they are not entitled to habeas relief based on trial
error unless they can establish that it resulted in 'actual
prejudice.'"  <u>Brecht</u>, 507 US at 637, citing <u>United States v Lane</u>,
474 US 438, 439 (1986).

As the California Court of Appeal found, the trial
court did not instruct on an additional theory that would have
permitted the jury to convict petitioner of manslaughter.
Petitioner fails to show that eliminating this theory resulted in
actual prejudice to him.  Thus, this claim must be denied.


B

In his second claim for relief, petitioner claims that
his constitutional rights to due process were violated because
the trial court's jury instructions allegedly allowed the jury to
convict him without finding that voluntary manslaughter was a
foreseeable consequence at the time he aided and abetted the
criminal activity.

This claim was rejected by the California Court of
Appeal in a reasoned opinion on direct appeal.  The state court
recited the lengthy instruction at issue and concluded that it
was erroneous.  Opinion at 14-15 (footnote 5).

After finding instructional error, the court first
noted that petitioner again incorrectly presumed that the only
viable theory for conviction was the natural and probable
consequences doctrine.  The state court went on as follows:

Defendant claims that it was reversible error to not tell the jury to assess for[e]seeability under the natural and probable consequences doctrine at the time defendant committed the act that made him an aider and abettor.

We reject defendant's argument. The jury was clearly told that they must find that defendant aided and abetted the commission of the target crime. In addition they had to find that a reasonable person would expect the consequence to be likely to occur in order for it to be a natural and probable consequence. Also the jury was told that the consequence must be in the normal range of outcomes if nothing unusual has intervened. This combination of instructions clearly informed the jury that the homicide must have been a foreseeable (natural and probable) consequence of the actual acts aided and abetted by defendant. The instruction clearly set forth that defendant was liable only for those offenses that were foreseeable from his own acts.

Opinion at 15.

As with his first claim of instructional error, petitioner has not demonstrated that the state court's reasoned opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law. Petitioner also fails to demonstrate that the state court's opinion relied on an unreasonable determination of the facts.

To prevail on this claim, petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 US at 72. As the state court reasonably concluded, the instructions given to the jury "clearly set forth that defendant was liable only for those offenses that were foreseeable from his own acts." Opinion at 15. Petitioner may disagree with the state court's conclusion, but his arguments do not demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established United States

Supreme Court law.  Furthermore, petitioner has failed to establish that any purported state court error had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 US at 638.  Petitioner is not entitled to federal habeas relief on this claim.

C

Petitioner's third claim also alleges that his due process rights were violated as a result of instructional error. Specifically, petitioner argues that it was prejudicial error for the trial court to instruct the jury that it could convict him for a death resulting from the natural and probable consequences of aiding and abetting an assault by means of force likely to cause great bodily injury or death.  According to petitioner, application of the natural and probable consequences rule in such circumstances improperly relieves the government of proving the requisite mental state necessary for a voluntary manslaughter conviction, and violates the principles announced in People v Ireland, 70 Cal 2d 522 (1969) (holding that a felony-murder instruction is not proper when the predicate felony is an integral part of the homicide).

This claim was considered and rejected by the California Court of Appeal in a reasoned opinion.  Relying primarily on People v Luparello, 187 Cal App 3d 410 (1986), the state court found that petitioner could not demonstrate instructional error, and that "the impediments to criminal liability as found in *Ireland* do not have persuasive value and are not applicable with respect to limiting an[] aider and

abettor's liability under the natural and probable consequences doctrine."  Opinion at 16-18.

As with claims 1 and 2, petitioner cannot demonstrate that the state court's rejection of claim 3 was either contrary to or an unreasonable application or, United States Supreme Court precedent, or an unreasonable determination of the facts. Petitioner also cannot establish that any purported state court error had a substantial and injurious effect or influence in determining the jury's verdict.  See <u>Brecht</u>, 507 U.S. at 638.

Indeed, petitioner cannot even clearly state a federal constitutional claim.  As the state court's opinion demonstrates, petitioner is alleging that the trial court's instructions violated California state law as set forth in <u>People v Ireland</u>, 70 Cal 2d 522 (1969).  Opinion at 16-18.  The United States Supreme Court has confirmed that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  <u>Estelle</u>, 502 US at 71-72; see also, <u>Stanton v Benzler</u>, 146 F3d 726, 728 (9th Cir 1998) (state law determination that arsenic trioxide is a poison as a matter of law, is not element of crime for jury determination and not open to challenge on federal habeas review); <u>Walker v Endell</u>, 850 F.2d 470, 475-476 (9th Cir. 1987) (failure to define recklessness at most error of state law where recklessness relevant to negate duress defense and government not required to bear burden of proof of duress).

Here, petitioner cannot show that the trial court's alleged violation of <u>Ireland</u> states a federal constitutional claim.  To the extent he is alleging that an <u>Ireland</u> violation is

a violation of federal due process law, his claim must fail as he he can cite to no relevant case or statutory law supporting such an argument. As the Ninth Circuit has stated, a petitioner "may not, . . . transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v Day, 110 F3d 1380, 1389 (9th Cir 1996).

Even if petitioner had properly stated a federal due process claim, he would not be entitled to relief because he has failed to establish that any purported state court error had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 US at 638. Accordingly, this claim must be denied.

D

In claim 4, petitioner alleges that his constitutional right to a speedy trial was violated. Specifically, he maintains that the state did not complete DNA testing in a timely manner, resulting in an unconstitutional delay in his trial.

The California Court of Appeal considered and rejected this claim in a reasoned opinion. After a detailed description of the relevant facts, including a recitation of petitioner's objections to the continuances granted as a result of the delay in DNA testing (Opinion at 18-21), the state court analyzed petitioner's claim:

> Defendant contends he was denied his state and federal constitutional rights to a speedy trial when the trial court continued the matter over his objection.
>
> "A defendant's right to a speedy trial is a 'fundamental right' secured by both the United States

and California Constitutions [U.S. Const., 6th Amend,; Cal. Const., art. I, § 15.]." (*Bailon v. Appellate Division* (2002) 98 Cal. App. 4th 1331, 1344.)

Defendant relies on the four-part balancing test announced by the United States Supreme Court in *Barker v. Wingo*, (1972) 407 U.S. 514 at page 530 to support his contention that his federal constitutional right to a speedy trial was violated. Under this balancing test, at least the following four criteria should be considered: "(1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant." (*People v. McDermott* (2002) 28 Cal. 4th 946, 987.)

* * *

"The length of the delay is the 'triggering mechanism' of the *Barker* analysis. 'Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.' [Citation.]" (*U.S. v. Dennard* (11th Cir. 1984) 722 F2d 1510, 1513.)

Here, five months had passed since the time defendant refused to waive further time for trial until the trial occurred, and one year had passed since the complaint was filed. Defendant cites to cases where a five-month delay was found to be significant in the weighing process. Defendant does not discuss the factors relevant to the delay, nor does he cite cases where a delay longer than five months was held not to violate the speedy trial guarantee. (See cases listed in *Greenberger v. Superior Court* (1990) 219 Cal. App. 3d 487, 502-503.) For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." (*Barker v. Wingo*, supra, 407 U.S. at p. 531.) Other than a capital murder, the charge here, first-degree murder, is the most serious charge that can be lodged against a defendant. Such a case should not be rushed to judgment. Also, defendant does not discuss the complexity of the case. This case involved three defendants, numerous witnesses, and scientific evidence requiring the testimony of experts. Defendant has cited to no evidence to dispute the trial court's finding that this was a very serious and complex case, and we find the evidence supports this finding and supports a one-year period to bring the case to trial. * * * Thus we hold that defendant has failed to show that the length of the delay was presumptively prejudicial.

Assuming for the sake of argument that the delay was sufficient to trigger further analysis, we discuss

the other *Barker* factors. * * *

Defendant argues that the state was responsible for the delay and this weighs in favor of finding a speedy trial violation. * * *

We do not interpret the record in the same manner as defendant. Although the People at one point admitted there was "some delay" getting the evidence from the Department of Justice to the laboratory where Davies wanted the evidence tested, there is nothing in the record to indicate this was anything other than an insignificant and minor delay. Defendant did not claim below that the time taken to test and retest items was unreasonable, and, in fact, at one point counsel for defendant stated that he agreed the testing could not be completed by the time set for trial. Defendant has not shown that the reason for the delay was unreasonable.

Next, defendant argues that his assertion of his speedy trial right is entitled to strong evidentiary weight in determining whether he was deprived of that right. Defendant did assert his objection to any further continuances and this is relevant in determining if he was deprived of his speedy trial right. Yet, this is merely one of the factors to be looked at.

Defendant claims he was prejudiced because many of the witnesses had vague recollections of the details of the incident. First, we note that no witnesses died or became unavailable as a result of the delay. Next, defendant has not demonstrated that the witnesses' inability to recall important details was related to the time delay rather than the normal inability of some witnesses to recall particular details. Defendant has not shown how witness inability to recall was exacerbated by the additional delay after defendant objected to any further continuances. Furthermore, with the exception of witnesses Isley and Davis, defendant has not particularized how any witnesses' failure or recollection might have harmed him.

Defendant contends that Isley's inability to accurately recall the events of February 27, 2001 prejudiced the defense. Isley could not recall exactly what time he saw defendant at McLaughlin's apartment the night of February 27, 2001 and the timing was critical to defendant's defense that he was not involved. Isley testified at trial that he could not remember the exact time that defendant returned to McLaughlin's apartment. On further questioning, he was asked if he remembered telling an investigator that he thought defendant returned home between 9 and 10 that

evening. He said that that would make sense since McLaughlin had a 10 o'clock rule – that she would not let anyone in her apartment after 10 o'clock at night. Thus, any forgetfulness on the part of Isley was rehabilitated with further questioning and, in fact, strengthened by his recall of the 10 o'clock rule. Defendant contends his defense was damaged because Isley could not remember when McLaughlin got a telephone call from Gilligan about a party getting out of control. As to that telephone call, Isley stated that even two years ago he had dismissed that information because he did not know if it was true or not and did not want to get involved in McLaughlin's fantasies. Isley's failure of recall on this fact was thus not shown to be based on the passage of time but, instead, because he did not want to get involved on this issue.

Defendant contends that Davis's failure of recollection regarding a conversation she had with him in April of 2001 allowed the People to infer a sinister motive to this conversation.

Davis testified that she saw defendant leaving the area of Gilligan's apartment at approximately 9:45 p.m. February 27, 2001. She also testified that in April of 2001 defendant came into her place of business, forcefully put his things down, and wanted to know why she had told police that he had been at Gilligan's house the night before. He was drunk at the time. Although Davis could not recall exactly what defendant asked her in the store, on further questioning she clarified the matter. Davis was asked about her report to the police of the April encounter with defendant. She was asked if she told the police that defendant asked her why she told the police that he left Gilligan's between 10:30 and 11. She recalled saying something along those lines and reaffirmed that she saw defendant around 9:45 on February 27, 2001. Thus, any failure of recollection was sufficiently clarified and Davis reaffirmed that defendant was leaving the area of Gilligan's apartment around 9:45. Defendant has not shown the requisite prejudice.

Defendant fails to discuss other factors relevant to the inquiry before us. The DNA evidence was a very important portion of the trial against defendant and the others. Davies sought a continuance to complete DNA testing of the evidence. Davies's assertion that he needed a continuance to properly test the DNA evidence was good cause for a continuance. The evidence was very important to the case. Defendant did not assert below that Davies's request for a continuance was not based on good cause, nor does he assert such a position on appeal. [footnote omitted]

> "Where a continuance is granted to a codefendant upon
> good cause, the rights of other jointly charged
> defendants are generally deemed not to have been
> prejudiced." (*Hollis v. Superior Court* (1985) 165 Cal.
> App. 3d 642, 646.)  Also, trying all defendants
> together offers an accurate assessment of relative
> culpability, an advantage that sometimes operates to
> the defendant's benefit. [citation omitted] Defendant
> was found less culpable that Davies; it appears he
> gained an advantage from the joint trial.  The
> interests of justice are better served by trying
> defendants jointly, avoiding the inequity of
> inconsistent verdicts. * * *

> The continuances granted by the trial court did
> not deprive defendant of his right to a speedy trial.

Opinion at 21-25.

Petitioner argues that the state court's decision

regarding his speedy trial claim was incorrect.  He cannot,

however, demonstrate that the state court's decision was contrary

to, or an unreasonable application of, clearly established United

States Supreme Court law or was based on an unreasonable

determination of the facts.  28 USC § 2254(d).

Petitioner primarily argues that the state court

misapplied the Barker factors and was mistaken in its conclusion

that the state was not responsible for any allegedly unreasonable

delay.  As petitioner acknowledges in his pleadings, however, "it

was co-defendant Davies actually moving for the continuances."

Traverse at 17.  The state court's detailed analysis properly

considered the relevant Barker factors, and fully addressed

petitioner's claim, even after a reasonable finding that

he had not shown that the length of the delay was presumptively

prejudicial.  Opinion at 22.  In addition, petitioner does not

cite to any persuasive caselaw or to any relevant parts of the

record that suggests that the state court's application of the

Barker factors was unreasonable.

Petitioner also argues, as he did on direct appeal, that the delay prejudiced him because several witnesses had vague memories of relevant details. The California Court of Appeal, however, thoroughly addressed this argument on direct appeal, reasonably concluding that any failure to recall was not necessarily based on the delay, and that petitioner had not been prejudiced by the testimony in question. Opinion at 23-24.

Finally, even if petitioner had been able to demonstrate that his constitutional right to a speedy trial had been violated, he would not be entitled to habeas relief because he has failed to establish that any purported state court error had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 US at 638. Petitioner's claim must be denied.

E

In his fifth claim for relief, petitioner claims that his due process rights and his right to a fair trial were violated when a portion of witness Keever's testimony was excluded. Terry Keever, a jail inmate housed near petitioner, testified for the state. During his testimony, Keever stated, inter alia, that petitioner had told him that he (petitioner) had nothing to do with the killing and that he (petitioner) thought that Davies had killed Gilligan. Keever also stated that petitioner told him that Mendez had put the knife used in the killing down a mineshaft. Upon objection by petitioner's counsel that Keever was testifying as to knowledge gained after he became

a government agent, the trial judge struck all of Keever's testimony concerning petitioner. Opinion at 26-28.

This claim was considered and rejected by the California Court of Appeal in a reasoned opinion on direct appeal.

> The exclusion of critical exculpatory evidence can result in the denial of the right to a fair trial. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) Due process violations can occur when excluded evidence is highly probative of the defendant's innocence. "[I]f the exculpatory value of the excluded evidence is tangential, or cumulative of other evidence admitted at trial, exclusion of the evidence does not deny the accused due process of law." (*People v. Smithey* (1999) 20 Cal. 4th 936, 996.)
>
> We find that defendant did not properly preserve the issue for appeal. It was defendant's objection to the testimony being elicited from Keever that resulted in the trial court's excluding all testimony from Keever about any statements made to him by defendant. The basis for this ruling was that Keever did not clearly articulate which conversations occurred before he became an agent for the state and which conversations took place afterwards. When, in response to defendant's objection, the trial court ruled that it would exclude all evidence from Keever regarding defendant, defense counsel did not make any argument to the court that it should excise a portion of the testimony and admit the excised portion. Having failed to make a request for differential treatment of the testimony below, defendant has forfeited that argument for purposes of appeal. (*People v. Saunders* (1993) 5 Cal. 4th 580. 589-590).
>
> Furthermore, the testimony by Keever that defendant told him he did not have anything to do with the killing of Gilligan was cumulative to defendant's own statement that he had nothing to do with the killing of Gilligan. The statement to Keever of defendant's noninvolvement did not have an independent origin but came from defendant himself and thus had no more reliability than defendant's actual testimony given under oath at trial. Error, if any, in excluding the testimony did not undermine the outcome of the case.

Opinion at 29-30.

Respondent first argues that, as the California Court of Appeal concluded, this claim is procedurally defaulted due to petitioner's failure to raise a contemporaneous objection to the trial court's decision to strike the portion of Keever's testimony that petitioner now argues would have been helpful to him. Opinion at 29. Under the doctrine of procedural default, federal courts will not review "a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v Thompson, 501 US 722, 729 (1991). Thus, if petitioner failed to comply with state procedural rules and was barred from litigating a constitutional claim in state court, the claim may be considered on federal habeas only if petitioner shows "cause" for the default and "actual prejudice" from failure to raise the claim, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. See id at 750.

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse v Kernan, 244 3d 702, 704 (9th Cir 2001), citing Michigan v Long, 463 US 1032, 1040-1041 (1983). A state law ground is interwoven with federal law if application of the state procedural rule requires the state court to resolve a question of federal law. Park v California, 202 F3d 1146, 1152 (9th Cir 2000), citing Ake v Oklahoma, 470 US 68, 75 (1985).

For a state procedural rule to be "adequate," it must be clear, well-established and consistently applied. Id The

issue of whether a state procedural rule is adequate to foreclose federal review is itself a federal question.  <u>Douglas v Alabama</u>, 380 US 415, 422 (1965).  The adequacy of a state procedural rule must be assessed as of the time when the petitioner committed the default.  <u>Fields v Calderon</u>, 125 F3d 757, 760 (9th Cir 1997). The burden of proving the adequacy of a state procedural rule lies with the state.  <u>Bennett v Mueller</u>, 322 F3d 573, 585-586 (9th Cir 2003).

California law has long required a defendant to make a timely and specific objection at trial in order to preserve a claim for appellate review.  See, e g, Cal Evid Code § 353; <u>People v Ramos</u>, 15 Cal 4th 1133, 1171 (1997).  The United States Supreme Court has acknowledged that a state court's application of the contemporaneous objection rule may constitute grounds for default.  See <u>Wainwright v Sykes</u>, 433 U.S 72, 87 (1977).  The Ninth Circuit has honored defaults for failure to comply with the contemporaneous objection rule.  See <u>Vansickel v White</u>, 166 F3d 953, 957-958 (9th Cir 1999).

In this case, the state court denied petitioner's claim because he did not object to the trial court's ruling and accordingly "did not properly preserve the issue for appeal." Opinion at 29.  As respondent agues, the state court found this claim to be procedurally defaulted due to lack of a contemporaneous objection, which has been found by the Ninth Circuit to be an independent and adequate state rule.  Petitioner does not argue to the contrary, nor does he argue either that there was cause for and prejudice from the default, or that defaulting the claim will result in a fundamental miscarriage of

justice.  As such, this court finds that petitioner's fifth claim
for relief is procedurally defaulted.

2

Petitioner's claim is also without merit.  He has not
shown that the state court's reasoned opinion was contrary to, or
an unreasonable application of, clearly established United States
Supreme Court law, nor has he shown that it was an unreasonable
determination of the facts.  28 USC § 2254.

The California Court of Appeal recognized that
petitioner was making a constitutional claim pursuant to <u>Chambers
v Mississippi</u>, 410 US 284, 302 (1973), which holds that a
defendant's due process rights may be violated when he or she is
prevented from presenting exculpatory evidence.  The state court
found that even if it had been error for the trial court to
exclude Keever's testimony, there was no prejudice because
Keever's testimony that petitioner had told him that he
(petitioner) had nothing to do with the killing was cumulative to
petitioner's own testimony under oath.  Opinion at 29-30.

Petitioner cannot demonstrate that the state court's
decision was unreasonable.  The state court correctly stated that
Keever's testimony "did not have an independent origin but came
from defendant himself and thus had no more reliability than
defendant's actual testimony given under oath."  Opinion at 29-
30.  The United States Supreme Court has held that it is a not a
violation of due process for a trial court to exclude evidence
that bolsters defendant's credibility.  See <u>United States v
Scheffer</u>, 523 US 303, 316-317 (1998).  In this case, Keever's

testimony was at best cumulative of petitioner's testimony and perhaps would have bolstered his credibility, but did not consist of any independent exculpatory factual evidence. Petitioner can cite to no case establishing that the state court's decision was in error. In addition, petitioner cannot show that any alleged error resulted in prejudice. <u>Brecht</u>, 507 US at 637. He is not entitled to habeas relief on this claim.

F

In his sixth claim for relief, petitioner maintains that his right to effective assistance of counsel was violated when his defense attorney allegedly opened the door for the prosecutor to introduce evidence of petitioner's prior convictions for violent crimes.

John Isley testified as a witness for petitioner. Petitioner's counsel questioned Isley about petitioner's behavior; Isley testified that he had never seen petitioner hit anyone or get in a fight. Based on these questions, the prosecutor argued that Isley was a character witness for petitioner, and that the government was now allowed to introduce evidence about petitioner's prior violent acts. The trial court agreed, and the prosecutor subsequently introduced evidence, over defense counsel's objection, of petitioner's prior convictions and arrest for assault and battery. The court had previously ruled that, if petitioner testified, he could be impeached with his conviction for felony assault. Opinion at 30-31.

Later during the trial, while acknowledging that the jury would probably have known of the felony assault conviction

28

even absent the court's later ruling, petitioner's counsel moved for a mistrial based on the character evidence.  The motion was denied, and the trial court ruled that the government could present opinion evidence regarding petitioner's reputation.  Opinion at 31-32.  The government subsequently presented two witnesses regarding defendant's character.  Officer Prock testified that, in his opinion, petitioner "can go from talking to being extremely belligerent and violent when you are dealing with him."  Opinion at 32.  Darlene Adams, the mother of petitioner's twin daughters, testified that in her opinion, defendant had a violent character.  On cross-examination, she admitted that in 1993, both she and petitioner were heavy drug users.  Opinion at 32.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must first establish that counsel's performance was deficient, i e, that it fell below an "objective standard of reasonableness" under prevailing professional norms.  <u>Strickland v Washington</u>, 466 US 668, 687-688 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i e, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id 694.

Petitioner has the burden of showing that counsel's performance was deficient.  <u>Toomey v Bunnell</u>, 898 F2d 741, 743 (9th Cir 1990).  Similarly, he must "affirmatively prove

prejudice." <u>Strickland</u>, 466 US at 693. Conclusory allegations that counsel was ineffective do not warrant relief. <u>Jones v Gomez</u>, 66 F3d 199, 205 (9th Cir 1995).

The California Court of Appeal considered and rejected this claim in a reasoned opinion on direct appeal.

We will assume for the sake of argument that trial counsel was ineffective when he opened the door allowing the People to present evidence of defendant's prior crimes and reputation in the community. But, we find that defendant has not demonstrated that it is reasonably probable a different result would have occurred in the absence of the error.

As part of his prejudice argument, defendant asserts that jury deliberations show this was a close case. He contends the closeness of the case was demonstrated by the length of deliberations (19 hours), the request for a readback of testimony (Keever's testimony), and that he was acquitted of the most serious charge (murder).

We disagree with defendant's assessment that this was a close case. In light of the numerous witnesses, length of trial, and the fact that this case involved three defendants, 19 hours of deliberations is not lengthy. The request for a readback of Keever's testimony was not surprising. There was confusion about Keever's testimony and the court struck some of his testimony, yet allowed part of it to remain. The readback was justified by this confusion and demonstrates diligence on the part of the jurors in ascertaining what evidence from Keever they could and could not consider. Defendant was not acquitted of the killing of Gilligan, but found guilty of a lesser included offense. The jury found differing liability among the three defendants. We do not think this demonstrates a close case, but believe it demonstrates that the jury was diligent and paid close attention to their duties while assessing individual responsibility for the crimes. Rather than proving the case was close, we believe the factors suggested by defendant suggest the jury conscientiously performed its duty. (*People v. Carpenter* (1997) 15 Cal. 4th 312, 422.)

Nor was the case close based on the evidence presented at trial. Defendant's blood was found at the crime scene, as well as his fingerprints. His voice was heard coming from Gilligan's home by a neighbor the night of the killing. Defendant was with Davies and Mendez at the store buying beer during the evening.

> There was very strong physical evidence tying Davies to
> the murder of Gilligan. Defendant was seen walking away
> from Gilligan's apartment before 10 o'clock.
>
> Furthermore, we agree with the trial court that
> this case was not going to turn on the basis of
> defendant's conduct with Officer Prock or with the
> mother of defendant's children in light of the fact
> that he was impeached with a felony conviction
> involving violent conduct. [footnote 9 omitted]  Thus
> the jury was aware that defendant had a violent past.
> [footnote 10 omitted]  The violent conduct evidence was
> tempered by Isley's testimony, based on knowing
> defendant for 20 years, that he was not a violent
> individual. Also, if the jury had been unduly inflamed
> by this evidence, they would have convicted him of
> murder instead of the lesser offense of voluntary
> manslaughter.
>
> Defendant has not affirmatively proved that but
> for counsel's error there is a reasonable probability
> that the result would have been different.

Opinion at 30-35.

Here, too, petitioner fails to demonstrate ineffective
assistance of counsel and cannot show that the state court's
reasoned opinion is contrary to, or an unreasonable application
of, clearly established United States Supreme Court law.
Petitioner also fails to demonstrate that the state court's
opinion relied on an unreasonable determination of the facts.
Even assuming petitioner could demonstrate that his counsel's
actions were deficient, he cannot show that there is a reasonable
probability that, but for his counsel's failure to open the door
to his prior convictions, the results of the proceeding would
have been different.  See Strickland, 466 US at 693, 694.

Petitioner argues, as he did on direct appeal, that the
evidence of his violent background was prejudicial and that the
jury deliberations of 19 hours show that this was a close case.
As the state court's lengthy analysis demonstrates, however, the

evidence against petitioner was extremely strong.  Opinion at 34.
In addition, given the lengthy trial, multiple defendants and
numerous witnesses, "19 hours of deliberations is not lengthy."
Id    Given the strength and volume of the evidence against
petitioner, along with the other factors cited by the state
court, petitioner cannot demonstrate that but for his counsel's
alleged errors, the result of his trial would have been
different.  <u>Strickland</u>, 466 US at 694.  He is not entitled to
federal habeas relief on this claim.

G

     In his seventh claim for relief, petitioner maintains
that the trial court committed prejudicial error when it failed
to instruct the jury regarding involuntary manslaughter.
Specifically, the trial court did not instruct the jury that "if
it had a reasonable doubt whether defendant committed voluntary
manslaughter, but believed he committed involuntary manslaughter,
they must give him the benefit of the doubt and find him guilty
of the lesser offense of involuntary manslaughter."  Opinion at
35.  The trial court did, however, instruct the jury with the
benefit of the doubt instructions between first degree murder and
second degree murder, and between murder and manslaughter.
Opinion at 37.

     This claim was considered by the California Court of
Appeal in a reasoned opinion on direct appeal.  Relying on <u>People
v Musselwhite</u>, 17 Cal 4th 1216, 1262-1263 (1998), the state court
denied petitioner's claim.  Opinion at 35-38.  The state court
found that, as in <u>Musselwhite</u>, the trial court in petitioner's

case had "instructed the jury with the benefit of the doubt instructions between first degree murder and second degree murder, and between murder and manslaughter. The court here also instructed the jury regarding specific intent or mental state, that they must adopt the interpretation which points to the absence of the specific intent or mental state (CALJIC No. 2.02), the instruction that the *Musselwhite* court found dispositive of the issue." Opinion at 37-38.

As with claims 1-3, which also involved alleged instructional error, petitioner cannot demonstrate that the California Court of Appeal's reasoned decision was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court law. Nor can he demonstrate that the state court's factual findings were unreasonable.

At the outset, the court notes that it is not clear that this claim states a violation of federal constitutional law. As with claim 3, petitioner is alleging that the trial court's instructions violated California state law, and the United States Supreme Court has confirmed that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas proceedings. Estelle, 502 US at 71-72. Nonetheless, because petitioner does generally allege in this claim that his federal due process rights were violated, the court will consider it on the merits.

To obtain federal collateral relief for instructional error, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 US at 72. Demonstrating

prejudicial error due to an omitted instruction is a particularly
heavy burden because "[a]n omission, or an incomplete
instruction, is less likely to be prejudicial than a misstatement
of the law." Henderson, 431 US at 155. Here, the state court
found that the jury had been properly instructed under state law,
and petitioner does not cite to any clearly established United
States Supreme Court law to the contrary. Moreover, petitioner
cannot demonstrate that he suffered any prejudice as the result
of the alleged instructional error. Brecht, 507 US at 638. This
claim must be denied.

H

Petitioner's eighth claim also alleges instructional
error; specifically, petitioner maintains that the trial court
erred in instructing the jury regarding aider-abettor liability.
While the jury was instructed generally on aider and abettor
liability, including the requirements for termination of the
liability of an aider and abettor, it was not instructed as to
the burden of proof it should apply in determining whether a
defendant had terminated his liability as an aider and abettor.

The Court of Appeal addressed and rejected this claim
in a reasoned opinion on direct appeal. It found that, even
assuming the trial court had a *sua sponte* duty to instruct the
jury on burden of proof, any error was harmless under Chapman v
California, 368 US 18 (1967). Opinion at 38.

> All of the defendants denied any involvement in
> the killing of Gilligan. None of them relied on a
> theory that they participated to some extent and then
> withdrew from participation in the crime. More

34

importantly, the evidence and the verdict do not demonstrate that the defendant was harmed by this claimed error. If the jury believed defendant's testimony, he would have been acquitted of the charge against him and the jury would have had no need to resort to the aiding and abetting instructions. There was evidence supporting a theory that defendant participated in the initial brutal beating but was not present when someone returned and slit Gilligan's throat. Although the slitting of Gilligan's throat was clearly first degree murder, the jury only found defendant guilty of voluntary manslaughter. Other than defendant's intoxication or the theory that the initial altercation was caused by a quarrel, which did not differ in any significant way from the evidence regarding Davies, there was nothing in the record to reduce the murder to manslaughter, yet the jury found Davies guilty of murder and defendant guilty of manslaughter. The only viable theory that may have resulted in finding defendant guilty of manslaughter and Davies guilty of first degree murder was that defendant was not present during the second incident and had withdrawn from participation in the criminal activities. Thus the jury accepted his withdrawal without being instructed on the burden of proof. No harm resulted.

Opinion at 39.

Assuming that petitioner properly states a colorable federal constitutional claim, his claim must fail.[3] Petitioner cannot demonstrate that the state court's rejection of his claim was contrary to, or an unreasonable application of, clearly established United States Supreme Court law, or relied on an unreasonable determination of the facts.

Here, the state court assumed that the trial court committed error when it did not give a specific burden of proof instruction on aider and abettor liability, but concluded that

_____

[3]As with Claim 3, it is unclear if petitioner is stating a cognizable claim. Given that petitioner is a prisoner proceeding pro se, however, the court will again assume that petitioner has properly stated a violation of his federal due process rights due to instructional error.

35

the error was harmless under <u>Chapman v California</u>, 386 US 18

(1967).  Opinion at 28-29.  This court may not overturn the state

court's conclusion unless the state court "applied harmless-error

review in an objectively unreasonable manner."  <u>Mitchell v

Esparza</u>, 540 US 12, 18-19 (2003) (citations omitted).  Having

reviewed the state court's opinion, as well as the underlying

record and the applicable caselaw, this court finds no support

for petitioner's allegation that the state court's conclusion was

"objectively unreasonable."

Finally, petitioner cannot demonstrate that the alleged

constitutional error in his case resulted in "actual prejudice"

to him.  Even if a petitioner meets the requirements of section

2254(d), habeas relief is warranted only if the constitutional

error at issue had a substantial and injurious effect or

influence in determining the jury's verdict.  <u>Brecht v

Abrahamson</u>, 507 US 619, 638 (1993).  The United States Supreme

Court has held that, even when a state court has found

constitutional error and addressed it under the <u>Chapman</u> standard,

a federal habeas court should apply the "more forgiving"

substantial and injurious effect standard announced in <u>Brecht</u>.

<u>Fry v Pliler</u>, 551 US 112, 127 SCt 2321, 2325-2328 (2007)

(confirming that the <u>Brecht</u> standard is "more forgiving" of trial

errors than the <u>Chapman</u> standard).

As discussed in detail *supra*, the California Court of

Appeal analyzed the alleged instructional error and found it to

be harmless beyond a reasonable doubt.  Opinion at 38-39.  The

state court examined the record, including the theories advanced

by the defense and petitioner's testimony, and concluded that

"the evidence and verdict do not demonstrate that the defendant was harmed by this claimed error."  Opinion at 39.  Petitioner may disagree with the state court's analysis, but he has not demonstrated that the state court's harmless error decision was contrary to, or an unreasonable application of clearly established federal law, nor has he demonstrated that it was based on an unreasonable determination of the facts.  28 USC § 2254(d).  Given that the standard to be applied on collateral review is "more forgiving" of trial error than the Chapman standard reasonably applied by the California Court of Appeal, petitioner cannot demonstrate "actual prejudice."  He is not, therefore, entitled to federal habeas relief on this claim.

I

In his ninth and final claim for relief, petitioner maintains that his upper-term sentence was imposed in violation of Blakely v Washington, 542 US 296 (2004).  The California Court of Appeal addressed and rejected this claim.  Opinion at 39-40.  Petitioner also raised this claim in his petition for review with the California Supreme Court; that court referenced petitioner's Blakely claim when it denied the petition "without prejudice to any relief to which defendant might be entitled to after [the California Supreme Court] determines in *People v. Black*, S126182, and *People v. Towne*, S125677, the effect of *Blakely v. Washington* (2004) ___ U.S. ___ 124 S. Ct. 2531, on California law."  Lodged Document 7.

Since the Court of Appeal's reasoned opinion denying petitioner's claim, other relevant cases have been decided.

Petitioner now bases his claims on the Supreme Court's holding in
Cunningham v California, 549 US 270 (2007), in which the Supreme
Court held California's determinate sentencing law[4] violates the
Sixth Amendment because it authorizes the judge, not the jury, to
find the facts permitting an upper-term sentence.[5]

Cunningham is the most recent in a line of Supreme
Court cases decided subsequent to Apprendi v New Jersey, 530 US
466 (2000).  In Apprendi, the Supreme Court extended a
defendant's right to trial by jury to findings of fact used by
the sentencing court to increase a defendant's sentence.  "Other
than the fact of a prior conviction, any fact that increases the
penalty for a crime beyond the prescribed statutory maximum must
be submitted to a jury, and proved beyond a reasonable doubt."
Id at 490.  Under Apprendi, the "statutory maximum" is the
maximum sentence a judge could impose based solely on the facts
reflected in the jury verdict or admitted by the defendant; in
other words, the relevant "statutory maximum" is not the sentence
the judge could impose after finding additional facts, but rather
the maximum he could impose without any additional findings.
Blakely v Washington, 542 US 296, 303-04 (2004).

In Cunningham, the Supreme Court applied the above
reasoning to California's determinate sentencing law ("DSL"), and
found it violated the Sixth Amendment because it allowed the

_____

[4] California's determinate sentencing procedures have since
been amended to be in compliance with the applicable law.

[5] The Court of Appeal found in petitioner's case that
California's determinate sentencing law was constitutional
(Opinion at 41), as the California Supreme Court later did in
People v Black, 35 Cal 4th 1238 (2005).

38

sentencing court to impose an elevated sentence based on aggravating facts that the trial court found by a preponderance of the evidence, rather than facts found by a jury beyond a reasonable doubt. Id at 860, 870-871. The Ninth Circuit has recently concluded that Cunningham did not announce a "new rule" for Teague purposes and thus is applicable to cases on collateral review. Butler v Curry, 528 F3d 624, 634-636, cert denied, 129 SCt 767 (2008).

Here, petitioner's Cunningham claim is without merit because the record of the sentencing shows the trial court did not err in imposing the upper term on the manslaughter conviction. In particular, the record shows the trial court relied upon the following aggravating factors to impose the upper term on the manslaughter charge: petitioner's prior convictions, the fact petitioner was on probation when the crime was committed, the nature of the crime, and the vulnerability of the victim. Opinion at 39-40. Under California's sentencing scheme, only one aggravating factor is necessary to support imposition of the upper term. Butler, 528 F3d at 639. Consequently, if at least one of the aggravating factors on which the trial court relied in sentencing petitioner was established in a manner consistent with the Sixth Amendment, petitioner's sentence was not in violation of the Sixth Amendment. Id at 643.

Contrary to petitioner's assertion, no Sixth Amendment violation occurred when the trial court relied upon the fact of petitioner's prior convictions to apply the upper term. As Apprendi made clear, the fact of a prior conviction is a sentencing factor that may be relied upon to enhance a sentence

without being submitted to a jury or proved beyond a reasonable doubt.  See <u>Apprendi</u>, 530 US at 490; <u>United States v Pacheco-Zepeda</u>, 234 F3d 411, 414-415 (9th Cir 2001), <u>cert denied</u>, 532 US 966 (2001) (relying on <u>Apprendi</u> to hold prior convictions, whether or not admitted by defendant on record, are sentencing factors rather than elements of charged crime).

It is clear from the record that at least one of the aggravating factors on which the trial court relied in sentencing petitioner was established in a manner consistent with the Sixth Amendment.  Accordingly, petitioner's <u>Cunningham</u> claim is without merit and must be dismissed.  See <u>Butler</u>, 528 F3d at 643.

III

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

_____
Vaughn R Walker
United States District Chief Judge